UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATURE'S ENERGY BANC, INC., a Michigan corporation, DANA FIELD, an individual, and JEFFREY BANCROFT, an individual

          Plaintiffs,

v.

UNIFIED HOLDING INTERNATIONAL, a Nevada corporation, UNIFIED ENERGIES INTERNATIONAL, a Nevada corporation, CLAY CLARK, an individual, and THOMAS RUOTOLO, an individual,

          Defendants.

Case number 10-12829
Honorable Julian Abele Cook, Jr.

ORDER

This lawsuit was initiated in the Wayne County (Michigan) Circuit Court by the Plaintiffs, Nature's Energy Banc, Inc. ("NEB"), Dana Field, and Jeffrey Bancroft, all of whom have accused the Defendants, Unified Holding International ("UHI"), Unified Energies International ("UEI"), Clay Clark, Willis Dunham, and Thomas Ruotolo, of the following: (1) a breach of the parties' contract, (2) the tortious interference with contractual relations, (3) the tortious interference with prospective business advantage, (4) defamation, (5) fraud and misrepresentation, (6) statutory conversion, (7) innocent misrepresentation, and (8) negligent misrepresentation. The case was removed to this federal court by the Defendants pursuant to 28 U.S.C. § 1441(b) on the basis of its diversity jurisdiction under 28 U.S.C. § 1332. The Defendants have now filed a motion which, if granted, would cause the venue in this case to be transferred to the federal courts in Nevada.

I.

Jeffrey Bancroft is a Michigan resident and the president of the NEB, which is a Michigan corporation that was formed in May of 2009 to pursue business opportunities in the design, manufacture, and production of wind turbines. All of the parties agree that - prior to the commencement of this lawsuit - the Plaintiffs associated themselves with Clay Clark, a Nevada resident and the president of two Nevada corporations (to wit, the UHI and the UEI). According to the Defendants, Clark (1) designed, created and developed a cone-shaped helicoid wind turbine (commonly known as the "Windstrument Turbine"), and (2) applied for a patent to protect his putative invention.[1] Although the Defendants acknowledge that Clark's patent application remains pending, they also note that he ultimately transferred his rights in the Windstrument Turbine to UHI.

Having apparently been introduced by representatives of Black Horse Energy, LLC ("Black Horse"), a non-party to this case, the two above-mentioned Nevada corporations, and Clark, (collectively, "Unified") and Bancroft decided to work together to develop, design, test, construct, and manufacture the wind turbines that had been conceived by Clark. In order to memorialize their business relationship, the parties entered into two agreements. The first was a "Non-Disclosure and Non-Circumvention Agreement" (dated April 8, 2009), in which Bancroft agreed, among other things, to (1) refrain from disclosing any of Unified's confidential information, (2) undertake all reasonable precautions to keep the information confidential, and (3) avoid creating business relationships that would constitute a conflict of interest in the absence of a mutually acceptable agreement.

---

[1] This application was assigned serial number 61/123,860, and publication number US2009/002256.

The "Non-Disclosure Agreement" contained a forum selection clause which (1) mandated that its terms be interpreted in accordance with Nevada law, and (2) indicated that both parties consented to the jurisdiction in the federal courts in the District of Nevada. Bancroft, while acknowledging that he signed this instrument, maintains that his name and signature were entered onto the document strictly in his personal capacity, and not as an officer or director of the NEB, which had yet to be formed.

After receiving the executed "Non-Disclosure Agreement" from Bancroft, Clark claims that he forwarded several pieces of confidential information to him, all of which related to the wind turbines, including three-dimensional Computer Aided Design ("CAD") drawings, a video of a working prototype, and still images of the device.[2] In exchange, Clark asserts that Bancroft made representations to him that he could manufacture not only the blades for the turbines (as originally contemplated), but would be able to turn the entire Windstrument Turbine into a commercially viable product. During the following month, he formed the NEB in an effort to effectuate his announced purpose.

The NEB disagrees with Unified's characterization of these events, contending that the only thing produced by the Defendants was "an idea," along with an incomplete, useless, conceptual two-dimensional drawing of a non-fully functioning wind turbine. Moreover, they submit that Clark falsely claimed to have had an ownership in a domestic and an international patent for electricity-generating wind turbines. They assert that it was these representations by Clark which induced them into believing that he possessed an advanced knowledge in the development of wind

---

[2] Nature's Energy claims that no confidential information was ever exchanged, nor was any information actually provided by Clark ever labeled as "Confidential," as required by the terms of the Non-Disclosure Agreement.

turbines. As a result, the Plaintiffs lament that it was these false representations that caused them to enter into a "Memorandum of Understanding" ("MOU") with the Defendants.

The MOU was created to allow Unified and the NEB to pursue necessary "cooperative technological development" in the renewable energy industry, with a primary focus on the production of small wind turbines in the form of the Windstrument. This MOU obligated the NEB to provide several services, including the completion of a production design, the construction of prototypes, the development of tooling (at its own expense) with a capacity to build at least 2,000 turbine units, conduction of experimental testing of the product, and the development of time lines and other details that are associated with a large-scale production of the Windstrument. In return, the NEB was granted the right to "control and source" all domestic manufacturing, to participate in royalties from international production, as well as to have an opportunity to secure an equity in Unified, along with production licensing and other potential financial benefits.

In response to the MOU and at Unified's urging, the NEB claims to have invested a considerable amount of time and resources into the development of a functional wind turbine. The NEB also maintains that it, while acting solely at its own expense and exclusively within Michigan, (1) developed various CAD drawings and computer-simulated models, (2) constructed production tooling for the creation of the turbine blades, (3) experimented with various materials to perfect the production process, (4) developed various blade designs and methods for attaching the blades to the turbine shaft, and (5) experimented with and ultimately developed the design of the shaft itself. Further, the NEB alleges that it was induced to continue its efforts, in part, by the Defendants' false representations about their prospects for landing large contracts to sell the wind turbines to nationally known distributors and retailers such as Macy's®, Target®, Wal-Mart®, and

Cleveland Price®, as well as to several private investors in Austin, Texas, and Port Elizabeth, South Africa. Overall, it claims to have expended more than $600,000 in out-of-pocket costs for its efforts, and notes that it was never paid $18,250 for the development of blades and shafts for fifty wind turbines prepared for Unified.

Unified submits that it soon became apparent that neither the NEB nor Bancroft had the capacity to manufacture the wind turbines or the blades. According to Unified, the NEB unilaterally contracted with a Canadian enterprise (to wit, Basic Tool Company) to manufacture the turbine blades. They also soon discovered that the NEB and Bancroft had outsourced the manufacturing of the turbines to other companies.

Unified proclaims that, in the course of this unauthorized outsourcing, some of these companies had been given confidential and proprietary information without its knowledge or permission. Further, Unified complains that Basic Tool has steadfastly refused to release some of its CAD drawings, molds and other items necessary for manufacturing because of its payment dispute with the NEB. Not surprisingly, the parties' relationship deteriorated shortly thereafter, with the NEB terminating their business dealings in May of 2010. This lawsuit followed three months later.

## II.

In bringing this motion, the Defendants maintain that transferring this lawsuit to the United States District Court for the District of Nevada is an appropriate measure to adopt under these circumstances. As reflected in 28 U.S.C. §1404(a), courts have broad discretion in deciding whether to grant or deny a motion to transfer. *Phelps v. McClellan,* 30 F.3d 658, 663 (6th Cir. 1994). This statute provides, that "[f]or the convenience of parties and witnesses, in the interest

of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). Within the Sixth Circuit, a party who seeks to obtain a transfer of a civil action under § 1404(a) must satisfy three criteria; namely, (1) the action could have originally been brought in the district court to which transfer is sought, (2) a transfer serves the interest of justice, and (3) the suggested transfer is for the convenience of the witnesses and parties. *Fluidtech, Inc. v. Gemu Valves, Inc.*, 457 F. Supp. 2d 762, 766 (E.D. Mich. 2006). The burden of proving these factors rests with the moving party who must establish its existence by a preponderance of the evidence. *Thomas v. Home Depot, U.S.A., Inc.*, 131 F. Supp. 2d 934, 936 (E.D. Mich. 2001).

Although the parties disagree about whether this case could have been filed originally in the District of Nevada, neither litigant has provided any in-depth assessment of all of the relevant factors, which include such issues as to whether the proposed transferee-court would have (1) subject-matter jurisdiction, (2) personal jurisdiction over all of the Defendants, and (3) the requisite elements of venue under 28 U.S.C. §§ 1332 and 1391. While it is clear that the subject-matter jurisdiction of the Court which is based on the diversity between the parties could be readily established, a less obvious factor is whether a federal court in Nevada could assert personal jurisdiction over each Defendant. Of particular concern are the circumstances relating to two Defendants, Thomas Ruotolo and Willis Dunham, both of whom are residents of California and New Mexico, respectively. Having received no information from the Defendants as to the nature and extent of the contacts of Ruotolo and/or Dunham with the state of Nevada, the Court is not in a position to evaluate whether an assertion of personal jurisdiction over either or both of them by the federal courts in Nevada would be proper. *See Chan v. Society Expeditions, Inc.*, 39 F.3d 1398,

1405 (9th Cir. 1994) (due process requires nonresident defendants to have minimum contacts with forum state so that exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice."). Moreover, the Defendants have not persuaded the Court that the forum selection clause within the "Non-Disclosure Agreement" (which it attributes to both of these individual Defendants) is controlling on this question, especially since this document does not form the basis of the Plaintiffs' lawsuit. Contrary to the Defendants' argument, personal jurisdiction does not derive solely from the Defendants' status as employees and/or officers of Unified. *See Klein v. Freedom Strategic Partners, LLC*, 595 F. Supp. 2d 1152, 1159 (D. Nev. 2009) ("Jurisdiction over an individual director or officer of a corporation may not be predicated on the court's jurisdiction over the corporation itself, unless the individual maintains contacts with the forum state that would subject him to the coverage of the state's long arm statute and comport with due process.") (quoting *Hoag v. Sweetwater Int'l*, 857 F. Supp. 1420, 1426 (D. Nev. 1994)).

However, the Court need not resolve this question because even if the Plaintiffs' lawsuit could have been properly filed in the District of Nevada, the Defendants have not demonstrated that a transfer would serve the best interests of justice or the convenience of the parties, as required by §1404(a). In undertaking this inquiry, courts must consider a number of factors, including (1) the convenience of the parties; (2) the convenience of the witnesses; (3) the location of relevant documents and relative ease of access to sources of proof; (4) the locus of the operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded the plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality

of the circumstances. *Overland, Inc. v. Taylor*, 79 F. Supp. 2d 809, 811 (E.D. Mich. 2000) (citations omitted).

Generally, courts may consider "any factor that may make any eventual trial 'easy, expeditious, and inexpensive.'" *Helder v. Hitachi Power Tools, USA Ltd.*, 764 F. Supp. 93, 96 (E.D. Mich. 1991). Although a plaintiff's chosen forum is not sacrosanct, a motion to transfer should not be granted unless the convenience factors strongly favor a defendant's choice of venue. *West American Ins. Co. v. Potts,* 908 F.2d 974, *2 (6th Cir. 1990) (citing *Nicol v. Koscinski*, 188 F.2d 537, 537 (6th Cir.1951)). An analysis of these factors follows.

Convenience of the Parties

The individual Plaintiffs argue that this factor favors them, inasmuch as both of them reside in Michigan. Noting that Dunham and Ruotolo are residents of New Mexico and California, respectively, the Plaintiffs submit that transferring venue at this time would not yield any benefit to either side in this dispute, in that it would merely shift the inconvenience from one party to the other. *Evans Tempcon, Inc. v. Index Indus., Inc*., 778 F. Supp. 371, 377 (W.D. Mich. 1990). Nevertheless, the Court finds that this factor must be resolved in favor of the Defendants. Clark, UHI and UEI are all deemed citizens of Nevada. Geographically speaking, California and New Mexico are much closer to Nevada than Michigan. This makes the convenience of that forum slightly more attractive. Although neither litigant has analyzed the relative means of the parties and/or their importance to the issues presented by the Plaintiffs' lawsuit, the question of location alone weighs in favor of the Defendants' arguments for transfer.

Convenience of the Witnesses

By contrast, the Court believes that an evaluation of the convenience of Nevada as a forum

tends to favor the Plaintiffs. The NEB has identified at least five local companies with whom it has or has had manufacturing contracts (to wit, Asahi Kasei Plastics of North America (Fowlerville, Michigan); Peak Industries (Dearborn, Michigan); Michigan Extruded Aluminum (Jackson, Michigan); Plastic Systems (Romeo, Michigan); and Basic Tool ( Windsor, Ontario). In response, the Defendants note that the Plaintiffs' representations on this point are unsupported by the record. However, the Defendants fare no better by merely arguing that the witnesses in this case - none of whom have been identified - reside in California, Texas, Nevada, New Mexico, and Michigan. Absent a demonstration from the Defendants that the most material witnesses to this case are in or near Nevada, the Court finds that this factor must be resolved in favor of the Plaintiffs.

### Accessibility of the Evidence

In similar fashion, the record better supports the Plaintiffs' assertion that the bulk of the relevant documentary evidence remains in Michigan, considering that the Defendants' only argument is that the actual wind turbines are physically located in Nevada. The Court is not convinced that bringing one of the turbines to the courtroom during trial would be necessary or that, if called upon to do so, such a device could not be transported to Michigan for a personal inspection by the Court and/or the jury. This conclusion is especially true given the Plaintiffs' representation that most of the turbines are located in Michigan. Thus, it appears, that this factor favors the Plaintiffs' chosen forum.

### Locus of the Operative Facts

As to the locus of the operative facts, the Court again finds that this factor favors the Plaintiffs. Although both parties concede that many of their interactions took place by phone and electronic mail, the Plaintiffs demonstrate that the bulk of their work for the Defendants occurred

in or near Michigan. This, they submit, includes the production of parts, extensive design work, the building of prototypes, testing and experimentation, the development of CAD drawings, the creation of computer simulated wind turbine models, and the development of tooling for building the turbines. In the judgment of the Court, all of this conduct by the parties is especially relevant to the pending breach of contract claim, in that it bears on the nature of the Plaintiffs' performance under the MOU. By contrast, the Defendants proclaim that the MOU and the Non-Disclosure Agreement were created in Nevada, along with the initial turbines and their underlying designs and drawings. Comparatively speaking, however, the Court finds that the weight of the evidence on this factor must be resolved in the Plaintiffs' favor.

### Remaining Factors

Inasmuch as the parties agree that Michigan and Nevada courts have relatively equal authority to compel the attendance of unavailable witnesses, this factor is neutral. The Court gives similar treatment to its assessment of the relative means of the parties because neither the Defendants nor the Plaintiffs have provided any meaningful evidence to support their respective claims in this regard.

The Court believes that the choice of forum clause within the Non-Disclosure Agreement has little impact on the issues raised by the Defendants, inasmuch as the interpretation and application of this document is fairly tangential to the Plaintiffs' claims for breach of contract and unfair business practices. Thus, from the standpoint of promoting judicial economy, the Court believes that this factor favors neither the Plaintiffs nor the Defendants. That having been said, the pendency of the existing Nevada lawsuit tips the scale very slightly in favor of the Defendants on this point. To the extent that this lawsuit was filed secondarily in time to the Plaintiffs' claims, the

advantage is somewhat minimal.

Conclusion

Because some of the most important factors (i.e., witness convenience, location of the evidence, and locus of the operative facts) favor a retention of venue in Michigan, the Court must, and does, deny the Defendants' motion for a transfer to the District of Nevada.

IT IS SO ORDERED.

Date: August 30, 2011
s/Julian Abele Cook, Jr.
JULIAN ABELE COOK, JR.
U.S. District Court Judge

CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on August 30, 2011

s/ Kay Doaks
Case Manager